UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARY LUCEY,

         Plaintiff,

   v.

SAINT-GOBAIN PERFORMANCE PLASTICS
CORP., HONEYWELL INTERNATIONAL INC.
f/k/a ALLIED-SIGNAL INC. and/or
ALLIEDSIGNAL LAMINATE SYSTEMS, INC.,
E.I. DUPONT DE NEMOURS AND COMPANY
and 3M CO.,

         Defendants.

Civ. No.   1:17-CV-1054 (LEK/DJS)

**<u>COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

---

Plaintiff, by her attorneys, as and for her complaint against defendants, alleges as follows:

<u>**PARTIES**</u>

1.    Plaintiff is a resident of the County of Rensselaer, State of New York currently residing at 10 Marc Drive, Hoosick Falls, New York.

2.    Defendant Saint-Gobain Performance Plastics Corp. ("Saint-Gobain") is and was at all times relevant hereto a corporation organized under the laws of California with its principal executive office located at 750 East Swedesford Road, Valley Forge, Pennsylvania.  Saint-Gobain is registered to do business as a foreign corporation in the State of New York.  Saint-Gobain employs approximately 1,200 people in New York.

3.    Defendant Honeywell International Inc., formerly known as Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., is a Delaware corporation with its principal

executive office located at 115 Tabor Road, Morris Plains, New Jersey.  Honeywell is registered to do business as a foreign corporation in the State of New York.

4.     In 1999, Allied-Signal Inc. (Allied-Signal) acquired Honeywell.  The combined company adopted Honeywell's name because of superior name recognition.

5.     Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies.  Together, these companies had operated in the United States since at least the early 1920s.  Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

6.     At all relevant times, AlliedSignal Laminate Systems, Inc. was a unit of Allied-Signal.

7.     Defendants Saint-Gobain and Honeywell, at various times relevant herein, and as described more fully below, operated manufacturing facilities at or around 14 McCaffrey Street, Hoosick Falls, New York, and 1 Liberty Street, Hoosick Falls, New York.  Defendant Honeywell also operated facilities on John Street and Lyman Street in Hoosick Falls, New York, and on River Road in Hoosick Falls, New York.

8.     Defendant E.I. DuPont deNemours and Company ("DuPont"), is and was at all times relevant hereto a corporation organized under the laws of Delaware with its principal executive office located at 974 Centre Rd., Wilmington, DE.  DuPont is registered to do business as a foreign corporation in the State of New York.  Defendant DuPont manufactured and sold ammonium perfluorooctanoate to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein.

9.     Defendant 3M Company ("3M") is and was at all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at

3M Center Building 220-11W-02, Saint Paul, Minnesota.  Defendant 3M manufactured and sold ammonium perfluorooctanoate to defendants Saint-Gobain and Honeywell that was used at these defendants' facilities in their manufacturing processes as described herein

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court pursuant 28 U.S.C. § 1332(a)(1), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant Saint-Gobain conducts substantial business in this District, and all Defendants have caused harm to plaintiff in this District.  Plaintiff also reside in this District.

## JURY DEMAND

12.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury of any and all issues in this action so triable of right.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

13.     Ammonium Perfluorooctonoate (APFO) dissociates in water to form perfluorooctanoate (PFO$^-$) and under acidic conditions is protonated to form perfluorooctanoic acid (PFOA).  For purposes of this complaint, APFO, PFO$^-$ and PFOA will all be generically referred to as "PFOA".

14.     PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as perfluoroalkyl substances (PFASs).

15. PFOA is a human-made chemical not found in nature. It is highly water soluble and PFOA particulate matter quickly and easily dissolves into rainwater and then readily percolates down to contaminate groundwater.

16. Defendant 3M is the inventor and original manufacturer of PFOA. It ceased manufacturing it in or about the year 2000.

17. Defendant DuPont began manufacturing PFOA after defendant 3M chose to stop making the chemical.

18. Historically, PFOA was used as a polymerization aid and as a dispersion and wetting agent in the manufacturing of fluoropolymers. PFOA is also used in a variety of consumer products to achieve water, oil, and grease repellency.

19. Companies utilized PFOA to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

20. PFOA was also a key component in the manufacturing of Teflon® and other similar coatings. In this process, PFOA is used as a surfactant, dispersing and wetting agent. It is not intended to be incorporated into the final product, although trace amounts remain.

21. PFOA is a white solid at ambient temperature, but exists as a vapor when heated during the process of Teflon® manufacturing and coating. The vapor exits through stacks in manufacturing facilities. When hot PFOA vapor exits through the stacks, it condenses back into solid form and, within minutes, it coagulates and forms micro-sized particulates ranging from 0.1 um to 1 um in diameter.

22. Due to its chemical structure, PFOA is biologically and chemically stable in the environment and is resistant to environmental degradation processes. It is particularly persistent

in water and soil and, because PFOA is water-soluble, it can migrate readily from soil to groundwater.  PFOA remains present in the environment long after it is initially released.

23.     In 2006, EPA implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies, including defendants DuPont and 3M.  The stewardship program's goal was (i) to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade to PFOA by 2010, and (ii) to eliminate PFOA from emissions and products by 2015.  According to EPA, all eight companies that participated in the program have attested that they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

**PFOA-Associated Health Risks**

24.     There are a number of health risks associated with exposure to PFOA, and these risks are present even when PFOA is ingested at, seemingly, very low levels (less than 1.0 part per billion (ppb)).

25.     In or about 1961 toxicologists working for defendant DuPont found that exposure to PFOA causes an increase in the size of the livers in rats and rabbits.  In 1962 the same effect was discovered by DuPont scientists when PFOA was ingested by dogs.  DuPont had received inquiries regarding the toxicity of PFOA as early as 1954.

26.     In the 1970s defendant DuPont documented high concentrations of PFOA in the blood of its factory workers at its Washington Works plant in West Virginia, showing that PFOA bioaccumulates and is not easily removed from the body.

27.     In 1980 PFOA animal toxicity studies were published by Griffith and Long in the JAIHA.

28.     By 1981 defendant 3M was aware that PFOA ingestion caused birth defects in rats.  Acting on this information defendant DuPont surveyed children born to workers of its Teflon Division and found birth defects in two of seven children born to PFOA exposed workers.

29.     By 1984 defendant DuPont became aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community. Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

30.     As early as 1987 PFOA carcinogenicity was reported in a study of rats exposed to PFOA.

31.     By 1993 defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a 3-fold excess occurrence of prostate cancer in workers employed more than ten years.

32.     By 1996 defendant DuPont was informed that testing linked PFOA to damage to DNA.

33.     In or about 1996 defendants DuPont and 3M commissioned studies to assess the effects of PFOA on humans by exposing monkeys to the chemical.  By November of 1998 defendants DuPont and 3M were aware that monkeys in this study were suffering from severe health effects.  By 1999 even the monkeys receiving the lowest dose of PFOA were suffering adverse health effects, including liver toxicity, and it was determined that there was no exposure level at which no observable effects could be found (NOEL) in primates.

34.     In or about 2000 the United States Environmental Protection Agency notified defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals manufactured by this defendant. Shortly thereafter defendant 3M publicly announced that it was voluntarily withdrawing from the perfluorinated chemical market, including its manufacturing of PFOA.

35.     In 2003 3M conducted a mortality study of its workers exposed to PFOS, a chemical closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

36.     A mortality registry kept by defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

37.     In 2008 defendant DuPont performed a study of its workers which showed an increase in kidney cancer mortality among its Washington Works employees.

38.     In 2009 defendant 3M performed a follow-up study of its workers exposed to PFOA which showed an increase in prostate cancer incidence in workers with moderate to high exposures.

39.     Toxicology studies show that PFOA is readily absorbed after ingestion or inhalation exposure.  PFOA has a half-life in the human body of 2 to 9 years.  PFOA binds to albumen in the blood serum and is concentrated in the liver and kidneys.  Indeed, PFOA is especially concerning from a human health standpoint precisely because it can stay in the environment and in the human body for long periods of time.

40.     PFOA is associated in the medical literature with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, non-Hodgkin's lymphoma, pancreatic cancer and ovarian cancer, as well as thyroid disease, high cholesterol, high uric acid levels, elevated

liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.  Studies of PFOA exposure in animals have shown the ability to cause other cancers not yet associated with human exposure.  The EPA has also advised that exposure to PFOA may result in developmental effects to fetuses during pregnancy or to breastfed infants, liver damage, and various immunological effects.

41.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans."  These health conditions can arise months or years after exposure to PFOA.

42.     In 2009, the EPA identified PFOA as an emerging contaminant of concern and issued a provisional health advisory stating that short term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects.  The provisional health advisory stated that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

43.     In May 2017, Minnesota established a health guidance value for PFOA in drinking water of 0.035 ppb (35 ppt).

44.     In 2013, New Jersey established a preliminary health-based guidance level of 0.04 ppb (40 ppt) in drinking water.

45.     In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

46.     In May 2016, EPA replaced its 2009 provisional health advisory with a new lifetime advisory.  The 2016 lifetime health advisory established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA.  EPA health advisories are non-enforceable on the states.

EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by EPA as an "estimate[] (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

47.     Prior to January 2016, PFOA was an unregulated contaminant within the State of New York.

**The Village of Hoosick Falls and the Town of Hoosick**

48.     The Village of Hoosick Falls has a population of approximately 3,500 individuals and is located approximately 30 miles northeast of Albany, New York.

49.     The Village of Hoosick Falls operates and maintains the municipal water system.

50.     The Village's municipal water system has approximately 1,300 service connections.  The Village estimates that its system provides water to nearly 95 percent of the Village's residents.

51.     The Village is near the center of the Town of Hoosick, located along Route 22 in Rensselaer County.  The Town of Hoosick has a population of approximately 6,900 individuals.

52.     There are over 800 private wells that provide drinking water to those living in the Town of Hoosick.

**PFOA Use in and around Hoosick Falls**

53.     For several decades beginning as early as the late 1950s, PFOA was used in manufacturing processes at facilities in and around Hoosick Falls.

54.     One of these facilities is a small factory located at 14 McCaffrey Street ("McCaffrey Street Site").  New York State has identified the McCaffrey Street Site as a

probable source for the presence of PFOA in the Village municipal water supply and local aquifer.  The State has characterized the McCaffrey Street Site as a "significant threat to public health or the environment."

55.    The McCaffrey Street Site began operation in or about 1961.  A company called Dodge Fibers Corporation owned and operated the factory at that time.

56.    Upon information and belief, in or about 1967, Oak Materials Group, Inc. purchased the assets and liabilities of Dodge Fibers, including the McCaffrey Street Site.

57.    Upon information and belief, in or about 1986, Defendant Honeywell, f/k/a Allied-Signal purchased Oak Materials Group, Inc., which included the assets and liabilities of the McCaffrey Street Site.  Allied-Signal operated the McCaffrey Street Site until 1996.

58.    Upon information and belief, in or about 1996, Defendant Honeywell (f/k/a Allied-Signal) sold the assets and liabilities of the McCaffrey Street Site to Furon Company (Furon).

59.    Upon information and belief, in or about 1999, Defendant Saint-Gobain purchased the assets and liabilities of Furon, including the McCaffrey Street Site.

60.    Defendant Saint-Gobain has continuously owned and operated the McCaffrey Street Site from the time it purchased the Furon Company to the present.

61.    Throughout the operation of the McCaffrey Street Site, each company manufactured stain and water resistant fabric and/or Teflon® at the factory and utilized PFOA manufactured by defendants DuPont and 3M.

62.    In manufacturing stain-resistant fabric, each company coated the fabric with a liquid solution containing PFOA (the "PFOA Solution").

63.    Saint-Gobain, Furon and Allied-Signal utilized trays for the application of the PFOA Solution to the fabric.  Employees added the solution to the trays during production runs and recovered a portion of the solution at the end of the run during each shift.

64.    During the drying process, heat would vaporize a portion of the PFOA, which was then discharged from the facility as fine particulate matter that was then transported by wind to the community.

65.    Defendants' employees, at the direction of corporate officers and supervisors, washed out and discharged the remaining PFOA Solution from the trays into drains on a daily basis during each shift.  Those floor drains resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

66.    On average, Saint-Gobain ran three shifts, five days a week at the McCaffrey facility.

67.     Saint-Gobain claims to have halted the use of PFOA at the McCaffrey plant in the coating operation around 2003. Between 2003 and 2014, it utilized PFOA-containing materials in the silicone rubber operation at the plant.

68.    Throughout the period during which Oak Industries, Allied-Signal and Furon owned the McCaffrey facility, each company also used PFOA in a solid form as a part of a separate manufacturing process.

69.    In addition to the above, Allied-Signal manufactured pressure-sensitive tapes, Teflon®-coated fabrics, and Teflon® sheet, tape and laminates while it owned the McCaffrey Street Site.

70.    Saint-Gobain also utilized PFOA in other processes at the McCaffrey Street facility between 1999 and approximately 2014.  Among other things, Saint-Gobain produced

PTFE (polytetrafluoroethylene) film, adhesive tapes and silicone rubber for aeronautical, automotive, food processing and energy applications.

71.     Oak Industries, Allied-Signal, Furon and Saint-Gobain utilized six large, approximately three-story ovens as a part of their manufacturing process.

72.     The use of the ovens produced a sticky residue that would adhere to the internal tubing or "stacks" within the oven, and PFOA comprised a part of that residue. During the 1980s, Allied-Signal employees routinely burned off residue from the McCaffrey plant stacks, a process constituting "open burning" in violation of New York air pollution control regulations then in effect.

73.     Defendants Honeywell and Saint-Gobain established a rotation by which each oven and its stacks were cleaned once every six weeks, with a different oven cleaned every Monday.

74.     Defendants' employees removed the residue in the stacks by washing the stacks in a large sink that measured approximately 3 feet by 3 feet by 20 feet in size.  At the end of each cleaning, the waste water from the cleaning was discharged down a drain and was  released into a septic system or catch basin near the McCaffrey plant.  Those floor drains and other discharge points resulted in the discharge of PFOA into the soil and, in turn, into the aquifer.

75.     New York State has identified at least three additional sites in and around Hoosick Falls that are likely sources of PFOA contamination.

76.     One of those sites is located at 1 Liberty Street ("Liberty Street Site").  Saint-Gobain currently owns this site and Allied-Signal (Honeywell) previously owned and operated this facility.  In July 2017, the New York DEC classified the Liberty Street Site as a Class 2 site, meaning that the site presents a significant threat to public health and/or the environment.

77.   DEC has identified the facility located on John Street in Hoosick Falls formerly operated by Oak Materials and Allied-Signal as an additional source of the contamination. In July 2017, it classified the John Street site as a Class 2 site meaning that the site presents a significant threat to human health and/or the environment.

78.   The New York DEC has also stated that its preliminary investigation has identified PFOA within the leachate coming from the former municipal landfill and stated that it anticipates classifying the former landfill as a p-site in the near future.  DEC has measured PFOA levels of 21,000 ppt within the leachate.  The landfill is adjacent to the Hoosic River and leachate from the landfill continues to migrate towards and into the river.

79.   Upon information and belief, Defendants Honeywell and Saint-Gobain discharged PFOA into the environment through other means and at other sites that will be revealed through the discovery process.

80.   Upon information and belief, the majority of PFOA used by defendants Saint-Gobain and Honeywell was purchased from and/or manufactured by defendants DuPont and 3M.

**Disclosure of PFOA Contamination**

81.   In or around 2007, the Village completed the construction of a new production well to supply municipal water to many of the residents of Hoosick Falls.

82.   The production well lies approximately 500 yards away from the McCaffrey Street Site.

83.   The Village conducted testing in fall 2014 that confirmed high levels of PFOA in the municipal water.

84.   In June 2015, the Hoosick Falls Water Department conducted tests on the effluent from its production well(s) in order to discern whether PFOA existed within the water supply.

85.     Shortly thereafter, the Village received the results from its production well(s) tests.

86.     Those tests again confirmed the presence of high concentrations of PFOA within the municipal water system.

87.     Testing of municipal water produced detections of 612 ppt, 618 ppt, 620 ppt, 151 ppt and 662 ppt for PFOA.

88.     Similarly, the Village oversaw the testing of certain private wells within the Village in the summer of 2015, and received results that included detections well above the current EPA Health Advisory level of 70 ppt.

89.     The Village's response to these test results was to reassure individuals within the community that the water was safe to drink.

90.     In October 2015, EPA Region 2 administrator Judith Enck learned of the PFOA test results taken in and around Hoosick Falls.

91.     On November 25, 2015, the EPA contacted the Village and recommended the use of an alternative drinking water source.  EPA further recommended that residents not use the municipal water for drinking and cooking.

92.     In early December 2015, the DOH released a fact sheet for the Village.  That fact sheet stated, in part, "Health effects are not expected to occur from normal use of the water."

93.     Village officials further minimized the potential risk of PFOA in the municipal water.

94.     The EPA repeated its recommendation to the Village on December 17, 2015, after learning that Village officials were downplaying the first EPA notice and suggesting that whether or not an individual used municipal water was a matter of personal choice.

95.     Unbeknownst to the community at the time, Saint-Gobain was privately negotiating with Village elected officials in an effort to minimize its liability.

96.     Shortly after the EPA's December 17 warning, Saint-Gobain began providing free bottled water to Village residents dependent on municipal water.  Saint-Gobain also agreed to fund the installation of a granulated activated carbon filter system on the municipal water system to remove PFOA from drinking water.

97.     On January 14, 2016, Healthy Hoosick Water, a local community group, sponsored a public meeting with personnel from the EPA, the DOH and the DEC.

98.     At that meeting, New York officials announced that New York State had submitted a letter to the EPA that day seeking the designation of the McCaffrey Street Site as a federal Superfund site.

99.     EPA officials acknowledged in that meeting that a Superfund designation would adversely impact the property values of the Village.

100.    During the mid-January meeting, residents dependent on private wells questioned state officials about whether their wells may also be contaminated.  State officials indicated that the DOH would test the private wells of any individual upon request.

101.    In fact, DOH put off testing most of the private wells in and around the Town of Hoosick and instead focused its resources on the wells nearest the McCaffrey Street Site.

102.    The DOH avoided providing private well testing for several more weeks.  In response to growing public outcry, however, the state finally reversed course and began testing the private well of anyone requesting it.

103.    In mid-January, a consultant hired by the state sent an email to DOH employees stating that "all of the manufacturing in the village went to the 'dump.'  Although the landfill

was decommissioned and capped several years ago all of the potential PFOA rich leachate goes to the treatment plant and eventually out to the Hoosic River.  It may be alarmingly high and we need to get at least a baseline level."  Testing later confirmed that wells and soil in close proximity to the Hoosick landfill were contaminated with PFOA.  Indeed, one water sample taken from the landfill showed PFOA at a concentration above 21,000 ppt.  Upon information and belief, Defendants discarded PFOA-laden waste at the landfill for years before it was decommissioned.

104.    The Hoosick Falls school district announced on January 22, 2016, that testing identified PFOA within its well water at its transportation center.

105.    On January 27, 2016, Governor Cuomo directed state agencies to use state Superfund money to address PFOA in the Hoosick Falls' municipal water system.  The State Health Commissioner said that the Saint-Gobain plant would be deemed a state Superfund site and designated it a Class 2 site.

106.    That same day, the governor announced a temporary emergency regulation to classify PFOA as a hazardous substance.  This designation became permanent upon adoption of a final agency rule, effective as of March 3, 2017.

107.    On January 28, 2016, the EPA advised that home owners with private wells should use bottled water if testing had uncovered PFOA level in their water at 0.1 ppb (100 ppt) or higher.  The EPA further recommended that home owners with private wells should use bottled water if no one has yet tested their well water.

108.    At that time, one or more local banks indicated that they would not advance funds for the purchase or refinancing of a home in Hoosick Falls.  Indeed, the Treasurer of Trustco Bank, Kevin Timmons, publicly confirmed that the bank was not writing new mortgages for any

home on the Village's municipal water supply.  Timmons indicated that lenders typically require that homes have access to potable water before financing is approved.

109.    Timmons further stated that financing would not be approved for homes on private wells until the water supply was tested for the presence of PFOA.  Homeowners with private wells would later be required to prove that their water was not contaminated as a prerequisite to acquiring financing.

110.    As a result of the presence of PFOA within the aquifer, the municipal water system and private wells, the property values in and around Hoosick Falls have experienced a significant decline since the presence of PFOA was disclosed in December 2015.  That decline persists to this day.

111.    On or around February 1, 2016, United States Senator Charles Schumer called on Saint-Gobain to disclose immediately the full extent of the pollution it caused.  Senator Schumer stated, "Saint-Gobain did this.  They've got to first come clean as to what happened, where they put the stuff, and then work on a plan to quickly clean it up."

112.    On February 5, 2016, news outlets reported that some Village residents were bathing by sponge because they were afraid of inadvertently ingesting water during a shower.

113.    On February 11, 2016, DEC identified Saint-Gobain and Honeywell as the parties potentially responsible for PFOA contamination at one or more properties in Hoosick Falls, including the McCaffrey Street Site.

114.    The DEC demanded at that time that each company enter into an enforceable Consent Order to characterize and investigate the extent of the contamination, to provide interim remedial measures to protect public health and drinking water supplies, to analyze alternatives

for providing clean and safe drinking water and, ultimately, to design and implement a comprehensive clean-up and remediation protocol.

115.    On February 13, 2016, DOH began offering blood testing to any Hoosick Falls residents who wished to have their blood tested for the presence of PFOA.   Over 3,000 individuals have participated in this program to date.

116.    By February 24, 2016, a newly installed interim carbon filtration system at the municipal water treatment plant became fully operational.   This carbon filtration system was replaced with a more permanent full capacity system in February 2017.   Despite the presence of the filtration system, residents continue to rely on bottled water for drinking.

117.    On February 26, 2016, state officials disclosed results from tests performed at private wells.   Of 145 wells tested, 42 showed PFOA contamination above 100 ppt.

118.    The DEC also announced at this time that it had commenced installation of point-of-entry treatment (POET) systems for homes with private wells.   DEC stated at that time that it had received 281 requests for POETs.   Throughout the spring, residents in and around Hoosick Falls would continue to deal with frustrations relating to installation and upkeep of POET systems.   As of the date of this Complaint, the state has installed over 800 POET systems on private wells in and around Hoosick Falls.

119.    In early March 2016, the state disclosed results from water samples taken from the Hoosick Falls Water Treatment Plant in or around February 2016.   The highest sample showed PFOA at a concentration of 983 ppt.

120.    On June 3, 2016, the DEC announced that it had reached agreement on two Consent Orders with Saint-Gobain and Honeywell.   These Consent Orders require Defendants to submit a Remedial Investigation/Feasibility Study that includes, *inter alia*, PFOA remediation

options and the creation of an alternate water source for the Village.  In addition, the Consent Orders require Defendants to conduct further study of the Liberty Street Site and the sites of John Street and River Road—each of which was classified as a p-site under New York law.

121.    Around the same time as DEC's announcement, state officials began releasing the results of blood testing performed in February and March of 2016.  Over the course of the following two months, DOH officials would release data gathered from testing over 3,000 individuals.

122.    Numerous residents received blood tests indicating that PFOA was present in their blood at alarming levels.  According to the DOH, the median blood level among those tested is 64.2 ug/L, a level that is 30 times higher than the national average level of 2.08 ug/L. The median for men 60 and over was 91 ug/L.

123.    The 95th percentile of Americans has 5.68 ug/L of PFOA in their blood.

124.    Virtually all of the long-time residents of Hoosick Falls who were using municipal water at the time of the discovery of the contamination had levels an order of magnitude or more above background levels of PFOA in their blood serum.

125.    Moreover, all residents and former residents of Hoosick Falls, including plaintiff, have been exposed in the past to PFOA at a level that meets or exceeds some health-based comparison value. The widespread water contamination and results of the state's blood testing led to shock and fear among the residents of Hoosick Falls.  Since the results were mailed, the State has been unable to provide any reasonable health guidance to those with elevated blood levels.

## DECLARATION AS STATE SUPERFUND SITE

126.    On February 16, 2016 the Saint-Gobain McCaffrey Street site was declared  a Class 2 State Superfund Site that "presents a significant threat to public health and/or the environment" by the New York State Department of Environmental Conservation.

127.    In July 2017, the Liberty Street and John Street locations were added to the State Superfund list and declared Class 2 sites as well.


## FACTS RELATED TO PLAINTIFF'S INJURIES

128.    Plaintiff Mary Lucey was born in 1982.  In June of 1991 plaintiff moved to 10 Marc Drive in Hoosick Falls and has since that time utilized water from the Village of Hoosick Falls municipal water supply for drinking, cooking, bathing, cleaning and other purposes.

129.    Upon information and belief, the Village of Hoosick Falls municipal water supply was contaminated with PFOA as of June of 1991 and plaintiff ingested this contaminated water, bathed in it and inhaled water vapor that was contaminated with PFOA until citizens were advised to stop drinking the water at the end of 2015.

130.    During her residency in the Village of Hoosick Falls, plaintiff Mary Lucey also inhaled particulate matter containing PFOA discharged from defendants Saint-Gobain's and Honeywell's facilities that was transported through the air and settled into dust and soil on her property.

131.    In August of 1998 plaintiff presented to her primary care physician with symptoms of recurrent diarrhea.  When these symptoms continued she was referred to a pediatric gastroenterologist who diagnosed plaintiff with ulcerative colitis.  Plaintiff has suffered the symptoms of this illness and required treatment for the same since that time.

132.    After being diagnosed with ulcerative colitis, plaintiff continued to unknowingly ingest, inhale and otherwise be exposed to water, soil and air contaminated with PFOA until late 2015, causing further exacerbation of her symptoms.

133.    Plaintiff's blood was tested in March of 2016 for PFOA and her level measured 35.1  ug/L.

## CLAIM I

## STRICT PRODUCT'S LIABILITY – FAILURE TO WARN
## AGAINST DEFENDANTS DUPONT AND 3M

134.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

135.    This Claim is brought under New York law.

136.    Defendants DuPont and 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed and/or supplied PFOA products for sale and sold such products to defendants Honeywell and Saint-Gobain in the ordinary course of their business.

137.    Upon information and belief, Defendants Honeywell and Saint-Gobain utilized the PFOA products supplied by defendants DuPont and 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

138.    The PFOA products sold by defendants DuPont and 3M to defendants Honeywell and Saint-Gobain were unreasonably dangerous to manufacturing workers and to residents of Hoosick Falls, including plaintiff, without adequate warnings and instructions to prevent discharge of PFOA into the environment and accumulation inside of the bodies of residents, including plaintiff.

139. Defendants DuPont and 3M knew or should have known that the PFOA products that they sold to defendants Honeywell and Saint-Gobain would be discharged into the environment and cause contamination of the water supply of and accumulation in the blood serum of residents living in the communities where their products were used, including plaintiff.

140. Defendants DuPont and 3M had actual knowledge of the health hazards associated with PFOA ingestion through both animal studies conducted by researchers employed or contracted by such defendants and through experience with each defendant's own workers, but, upon information and belief, failed to communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of them at the Hoosick Falls facilities.

141. Defendants 3M and DuPont acted with reckless indifference to the health and safety of workers using their PFOA products and residents in communities where their PFOA products were used by failing to provide adequate warnings of the known dangers of PFOA when discharged into the environment and ingested by nearby residents, such as plaintiff.

142. As a direct and proximate result of the sale of their defective PFOA products lacking proper warnings and instructions, plaintiff has suffered illness and damages, both economic and non-economic, which exceed $75,000.

143. As a direct and proximate result of the sale of PFOA products lacking proper warnings and instructions, plaintiff is entitled to consequential damages covering the cost of medical monitoring and surveillance for other illnesses that may develop as a result of her exposure to and accumulation of PFOA in her body.

## CLAIM II

## NEGLIGENCE AGAINST ALL DEFENDANTS

144.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

145.    This Claim is brought under New York law.

146.    Defendants knew or should have known that use of PFOA Solution and/or the discharge of PFOA into the air, ground and sewer system was potentially hazardous to human health and the environment and required Defendants to take adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

147.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge filters or trays containing PFOA Solution onto the ground within floor drains in, and in close proximity to, the McCaffrey Street, Lyman Street and Liberty Street Facilities.

148.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the residue from the manufacturing ovens and their stacks.

149.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA vapors to exit from stacks at the facility without adequate control measures.

150.    Upon information and belief, defendants Saint-Gobain and Honeywell, knew or should have known of the information compiled by defendants 3M and DuPont about the health hazards associated with exposure of human beings to PFOA.

151.    Defendants Saint-Gobain and Honeywell had a duty to take all reasonable measures to ensure that PFOA Solution and/or PFOA would be effectively contained and not discharged into the surrounding environment.

152.    Defendants Saint-Gobain and Honeywell further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents of Hoosick Falls and the surrounding area, including plaintiff.

153.    Defendants Saint-Gobain and Honeywell breached the above-stated duties by unreasonably disposing of PFOA Solution and/or PFOA in a manner that guaranteed PFOA would enter the environment, including the groundwater and be ingested by residents, including plaintiff.

154.    Defendants 3M and DuPont had a duty to warn users of their PFOA products of the dangers of releasing PFOA into the environment.

155.    Defendants 3M and DuPont breached the above-stated duty by failing to adequately warn and provide sufficient instructions to foreseeable users of the products including employees handling and disposing of them at the Hoosick Falls facilities, to avoid discharging PFOA into the environment where it was likely to enter the ground water and be ingested by residents such as plaintiff.

156.    As a result of Defendants' breaches of their duties, the drinking water in and around Hoosick Falls, New York became contaminated with unsafe levels of PFOA which was ingested by plaintiff.

157.    Upon information and belief, defendants 3M and DuPont were grossly negligent, acted with reckless indifference to the health and safety of the public and/or intentionally failed to make public or provide to users of their products information these defendants possessed about the potential danger and harm that accumulation of PFOA in human beings resulting from discharge of PFOA into the environment could cause.

158.    Upon information and belief, defendants Saint-Gobain and Honeywell were grossly negligent, acted with reckless indifference to the health and safety of the public, and/or intentionally failed to prevent PFOA from being discharged into the environment and in failing to inform the Village of Hoosick Falls or the public in general of the potential that PFOA was contaminating its municipal water supply.

159.    As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiff has suffered illness and injury caused by the accumulation of PFOA in her body entitling her to compensatory and consequential damages, including the cost of medical monitoring.

## PRAYER FOR RELIEF

Plaintiff requests the Court to enter judgment against the Defendants, as follows:

A.    Compensatory damages against all defendants in an amount that will fairly and adequately compensate plaintiff for her personal injuries caused by her exposure to and ingestion of PFOA and defendants' defective products and negligent, grossly negligent, reckless and/or intentional conduct in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. §1332(a);

B.    Consequential damages against all defendants for the costs of medical monitoring and surveillance of plaintiff in the future made reasonably necessary by defendants' conduct in causing her to be exposed to, ingest and accumulate PFOA in her body, in an amount in excess of the jurisdictional limits of this Court pursuant to 28 U.S.C. §1332(a);

C.    Punitive damages against all defendants as a result of their grossly negligent, reckless and intentional actions in harming plaintiff;

D.    An award of attorneys' fees and costs, as permitted by law;

E.    An award of pre-judgment and post-judgment interest, as provided by law;

F.    Leave to amend this Complaint to conform to the evidence produced at trial; and

G.    Such other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper.

Dated:  September 21, 2017
        Rochester, New York

Respectfully submitted,

**FARACI LANGE, LLP**

_s/Stephen G. Schwarz_____
By: Stephen G. Schwarz
_sschwarz@faraci.com_
Hadley L. Matarazzo
_hmatarazzo@faraci.com_
28 East Main Street, Suite 1100
Rochester, New York 14614
Telephone: (518) 325-5150
Facsimile: (518) 325-3285

**WILLIAMS CEDAR, LLC**
Gerald J. Williams
_gwilliams@williamscedar.com_
1515 Market Street, Suite 1300
Philadelphia, Philadelphia 19102
Telephone:  (215) 557-0099
Facsimile:  (215) 557-0673

**CHAFFIN LUHANA LLP**
Eric Chaffin
*chaffin@chaffinluhana.com*
Roopal P. Luhana
*luhana@chaffinluhana.com*
600 Third Avenue, 12th Floor
New York, New York 10016
Telephone:  (888) 480-1123
Facsimile:  (888) 317-2311

**BEREZOFSKY LAW GROUP, LLC**
Esther E. Berezofsky
eberezofsky@wcblegal.com
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Telephone: (856) 667-0500
Facsimile: (856) 667-5133


*Attorneys for Plaintiff*